## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**D'JANGO HENDRIX,**

      **Petitioner,**

         **v.**

**WARDEN, LEBANON
CORRECTIONAL INSTITUTION,**

      **Respondent.**

**Case No. 1:17-cv-623**

**JUDGE DOUGLAS R. COLE**
**Magistrate Judge Merz**

### OPINION AND ORDER

On January 11, 2014, a neighborhood shootout occurred in Springfield Township—a suburb in the greater Cincinnati area. The State of Ohio indicted Petitioner D'Jango Hendrix in connection with that shooting, in which it charged him with multiple counts of attempted murder, felonious assault, and illegal possession of a firearm. Hendrix was tried and convicted on all counts in February 2015. He now brings this federal habeas petition alleging that numerous constitutional errors infected his trial. After a response from the State of Ohio and a reply from Hendrix, Magistrate Judge Merz issued a Report and Recommendation (R&R) as well as a Supplemental R&R advising this Court to deny habeas relief and to dismiss the petition with prejudice. The Court **ADOPTS** both the R&R (Doc. 88) and the Supplemental R&R (Doc. 107) and **DISMISSES** the petition (Doc. 1) **WITH PREJUDICE**. Accordingly, the Court **OVERRULES** Hendrix's corresponding Objections to those R&Rs, (Docs. 105, 116).

# BACKGROUND

## A.    The Incident

On January 11, 2014, Jay Dillon hosted a bonfire for several neighbors in his backyard. (State Ct. R., Doc. 7-3, #695–98). The group initially included four men: Jay Dillon, Donald Raines, Chris White, and Kevin Tye. (*Id.* at #696). The men enjoyed some beer, ate some pulled pork, and burned their old Christmas trees. (*Id.* at #697–99). At around 11:00 p.m., Hendrix walked over and joined the group. (*Id.* at #699). Dillon offered him a beer and some pulled pork. (*Id.*). Everything was going smoothly until another neighbor, Kent Worley, walked over from his house across the street. As everyone but Hendrix tells it, when Worley joined the group, Hendrix suddenly got up and seized Worley by his coat collar and angrily muttered something about Worley knocking off Hendrix's glasses. (Doc. 7-2, #569–70; Doc. 7-3, 619–20, 637–39, 672, 699–700). Dillon separated them and demanded Hendrix apologize, to which Hendrix replied that he refused to apologize to a "white motherf*****." (Doc. 7-3, #700–01 (alteration added)). Dillon instructed Hendrix to leave. (*Id.* at #701). As Hendrix did so, he stated, "I'm leaving, but I'll be back with a burner." (*Id.*). Hendrix crossed the street back to his home. (Doc. 7-2, #572; Doc. 7-3, 640).

Troubled by Hendrix's statement, Dillon went inside to check on his children, and grabbed his .45 caliber handgun, which was loaded with hollow-point bullets. (*Id.* at #703, 708, 722). Chris White followed him and walked toward the carport at the front of Dillon's house. (*Id.* at #674–75). Kevin Tye and Donald Raines stayed by the firepit. (Doc. 7-2, #574). Shortly afterward, the porch light in front of Hendrix's home was turned on and Hendrix stepped out of the home holding his hand by his belt

buckle. (*Id.* at #574–75). As Hendrix began walking towards the street, Tye walked over to the front of Dillon's house to tell Dillon that he thought Hendrix had a gun. (*Id.* at #575). As Hendrix approached the street, Raines saw him pull out a gun, aim towards the firepit where Raines was still sitting, and fire. (Doc. 7-3, #641). Raines ran to hide behind a nearby tree and called 911. (*Id.*).

At the same time, Dillon exited the front his house with his handgun. (*Id.* at #704–05). He heard two shots and then turned to see Hendrix point the gun towards Dillon and fire a third shot. (*Id.* at #705–06). Dillon moved to the middle of his yard to take cover behind a tree and fired back emptying seven rounds from his magazine. (Doc. 7-2, #577; Doc. 7-3, 706–08). One of the bullets struck Hendrix's abdomen, causing him to stumble and fall. (Doc. 7-4, #899–900). He then got up and fled by diving over a neighbor's fence. (*Id.* at #903–04). Hendrix proceeded to ring the doorbell of the neighbor's house, but no one answered. (*Id.* at #905). He then went around the back of the house and collapsed in a chair on the back porch. (*Id.*).

Hendrix tells the beginning of the story differently. According to Hendrix, he walked over to the bonfire and greeted a couple of the men when Dillon approached Hendrix and told him that Worley felt disrespected. (*Id.* at #884). Hendrix was bewildered but nevertheless sat down and ate some pulled pork. (*Id.* at #884–86). At some point, Worley and Hendrix simultaneously stood up and headed their own way, away from the firepit. (*Id.* at #886). As Hendrix was walking away, he turned towards Dillon to ask a question and noticed that Worley was directly behind him. (*Id.* at #887). Hendrix then demanded to know why Worley was "sneaking up" on him. (*Id.*).

It was this exchange, Hendrix claims, that prompted the rest of the men to separate Hendrix from Worley. (*Id.* at #888). After Dillon told Hendrix to leave, Hendrix went home, retrieved his wife's gun, stepped out on his porch, and began walking towards the street. (*Id.* at #891, 894, 896). When Hendrix was midway down his driveway near the back of his truck, something to Hendrix's left caught his eye, which caused him to turn. (*Id.* at #896). At that moment, Hendrix claims he was shot in the abdomen. (*Id.*). Hendrix maintains that *after* he got shot, he stood up and returned fire. (*Id.* at #903).

In any event, police soon arrived at the scene. They interviewed the rest of the men involved while Hendrix was taken to the hospital by ambulance. (*Id.* at #809–10, 906). After investigation, the State of Ohio indicted Hendrix in a ten-count indictment. (Doc. 7, #43–49). Those counts included four counts of Attempted Murder (Counts 1–4) with specifications (possession of a firearm and brandishing of a firearm), four counts of Felonious Assault (Counts 5–8), and two counts of Having Weapons While Under Disability (Counts 9–10). (*Id.*). Hendrix pleaded not guilty, and the case proceeded to trial.

**B.    The Trial**

During pretrial voir dire, the government asked the prospective jurors about their backgrounds. Juror 1 shared that her husband was criminally charged for harassing his ex-girlfriend over the telephone. (Doc. 7-1, #392). When the government asked her who investigated that case, Juror 1 stated that it was the Springfield Township Police Department—the same department that investigated the

neighborhood shooting at issue. (*Id.* at #393). When asked whether that experience would prejudice or bias her outlook on the case in any way, Juror 1 denied that it would affect her. (*Id.* at #394). The government also asked her whether she or a family member had been involved in any civil lawsuits. (*Id.*). She stated that she had been involved in an unrelated civil lawsuit but that it would not bias her view of the court system. (*Id.*).

Defense counsel then asked the prospective juror pool whether they could weigh and judge the credibility of witnesses' testimony independently, rather than automatically believing the story of four witnesses over the contrary story of one person. (*Id.* at #457–58). He asked, "Is there anyone [that] thinks that maybe you might believe the one person, but you would be persuaded [the other way] because there were four people on the other side of the story?" (*Id.*). Juror 12 answered, "I think I could be persuaded hearing four of the same stories versus one." (*Id.* at #458). When defense counsel pressed Juror 12 on whether it would be possible for four people to concoct a false story, Juror 12 responded, "I know it's possible that they could come up with the same one, but being honest, I would be persuaded." (*Id.*). At sidebar, defense counsel moved to strike Juror 12 for cause, arguing that she could not fairly hear the case given her inclination to believe four witnesses rather than one. (*Id.* at #488). The trial court stated it would try to rehabilitate Juror 12 to address defense counsel's concerns and proceeded by asking whether Juror 12 would automatically believe four witnesses over one or would rather weigh the testimony of each person individually. (*Id.* at #460–61). Juror 12 stated she would weigh the

testimony independently and would be fair and listen to all the parties. (*Id.* at #461). After that answer, defense counsel withdrew his motion to strike. (*Id.* at #488–89).

After voir dire, the government peremptorily struck Juror 1. (*Id.* at #462). Defense counsel objected under *Batson v. Kentucky*, 476 U.S. 79 (1986), arguing that the government was striking Juror 1 because she was a black female. (*Id.* at #489). The government stated that it struck Juror 1 because of her husband's criminal background, her involvement in civil lawsuits, and because she seemed "too eager to serve." (*Id.*). The trial court ruled that the government's reasons were race neutral and overruled the *Batson* objection. (*Id.*). Defense counsel did not use any peremptory strikes during the entire voir dire process. (*Id.* at #468).

After jury selection, Hendrix stipulated that he had committed the two prior offenses named in Counts 9 and 10 of the indictment which would establish his legal disability to owning a firearm. (Doc. 7-2, #499–500). Specifically, that he had prior felony convictions for burglary and intimidation and for trafficking cocaine. (Doc. 7, #48–49).

During the trial, the government called Kevin Tye, Donald Raines, Chris White, Kent Worley, and Jay Dillon as witnesses. All five testified to the version of events described above. After the state rested, Hendrix took the stand, narrating a story in which he was shot in his driveway first and returned fire only after he was hit. On cross-examination, the government impeached Hendrix with his prior convictions, which included several drug trafficking convictions, a felony burglary conviction, owning a weapon while under disability, felony harassment, illegal

possession of a firearm in a liquor establishment, felony intimidation, and discharge of a firearm near a premises. (Doc. 7-4, #914–16). Defense counsel objected to the government's asking Hendrix about these prior convictions by noting that Hendrix had already stipulated to two prior offenses for the purposes of Counts 9 and 10 of the indictment. (*Id.* at #923–24). The trial court overruled the objection but limited the government to asking only whether Hendrix had committed the crimes— forbidding a detailed inquiry into the factual background of the prior convictions. (*Id.*).

After Hendrix relayed his version of events, the defense called the charge nurse who was on shift the night Hendrix was admitted to the hospital for his gunshot wound. Defense counsel asked the nurse about the diameter of Hendrix's gunshot wound and the distance from the ground of the entry and exit wounds. (*Id.* at #931– 33). The nurse responded that the wound was nine millimeters in diameter and that the exit wound on Hendrix's back was roughly two inches higher than the entry wound on his abdomen. (*Id.*).

During closing arguments, the defense attempted to argue that the location of Hendrix's entry and exit wounds demonstrated that Hendrix was shot at an upward angle—an angle incompatible with what the government had claimed were the relative positions of Dillon and Hendrix. (Doc. 7-5, #984–86). The government objected to the argument contending that defense counsel was inappropriately acting as an expert witness. (*Id.* at #1056). The trial court sustained the objection. (*Id.*). After deliberation, the jury found Hendrix guilty on all counts. (*Id.* at #1061–66).

## C. Direct Appeal

Hendrix appealed his conviction, raising seven assignments of error: that (1) the trial court erred by (a) letting the government impeach Hendrix with his prior convictions when Hendrix had stipulated to two convictions for Counts 9 and 10, and (b) forbidding defense counsel from arguing that Hendrix must have been shot at an upward angle; (2) the trial court erred by overruling Hendrix's *Batson* challenge; (3) defense counsel provided ineffective assistance by (a) allowing unrecorded sidebars during the trial, (b) failing to use a peremptory strike on Juror 12, (c) failing to make an opening argument, and (d) failing to call a ballistics expert; (4) Hendrix was convicted on insufficient evidence; (5) Hendrix's convictions were contrary to law; (6) Hendrix was denied a fair trial because of the cumulative effect of the aforementioned errors; and (7) Hendrix's sentence was contrary to law. (Doc. 7, #79–82, 94–116). The Ohio First District Court of Appeals affirmed the trial court, in an opinion adjudicating each assignment of error on the merits. *See State v. Hendrix* 2016-Ohio-2697 (1st Dist.) (*Hendrix I*). Hendrix appealed to the Supreme Court of Ohio, (Doc. 7, #180), which declined jurisdiction on September 14, 2016, (*id.* at #216).

## D. Post-Conviction Petitions

After the Ohio Court of Appeals affirmed Hendrix's conviction, Hendrix filed a post-conviction petition pursuant to Ohio Revised Code § 2953.21, et seq., and Ohio Criminal Rule 35. (Doc. 7, #217). In his petition, Hendrix argued that his trial counsel was ineffective for failing to present expert forensic testimony about the type of ammunition and the trajectory of the bullet that struck Hendrix. (*Id.* at #231). He

8

attached to his petition the expert report of Gary Rini, a former law enforcement investigator turned forensic consultant. (*Id.* at #245, 253). The Rini report stated that the investigation of the neighborhood shooting was flawed in multiple ways. Most relevant here,[1] the report stated that (1) the police department failed to do a gunshot residue analysis on the other men involved, (*id.* at #266); (2) the police department failed to conduct bloodstain pattern analysis to determine whether Hendrix was in the street (as the neighbors claim) or midway up his driveway (as Hendrix claims), (*id.* at #266–67); (3) because all seven bullets fired by Dillon were not recovered, a second shooter possibly fired an eighth bullet at Hendrix, (*id.* at #267); and (4) if Hendrix had been holding his revolver when he was shot, he would likely have dropped it, but if it was in his waistband, he could have drawn it and fired back—all supporting the finding that Hendrix did not fire first, (*id.* at #268).

The trial court dismissed the post-conviction petition by way of a short order, stating that (1) the doctrine of res judicata barred the claim, (2) the affidavit and report were not credible, and (3) Hendrix had established no ground for relief. (*Id.* at #283). The Ohio Court of Appeals affirmed that determination—albeit in an unusual fashion. First, it held that the trial court erred by holding that res judicata barred Hendrix's claim. *State v. Hendrix*, 2018-Ohio-3754, ¶ 5 (1st Dist.) (*Hendrix II*). But,

---

[1] The expert report criticizes the police investigation over several alleged deficiencies that this Court can describe only as immaterial. (*See* Doc. 7, #266 (criticizing police for failing to give *Miranda* warnings to the neighbors involved and condemning the department for filing charges against Hendrix before its investigation was complete)). The report also contains several legal conclusions the expert is not qualified to make. (*See id.* at #265, 268 (criticizing the police department for searching Hendrix's home without a warrant and criticizing the government for objecting to the nurse, who testified as an expert witness)).

because the trial court had released the exhibits presented in the post-conviction petition and because Hendrix did not independently attach the exhibits on the appellate docket, the appellate court held it could not independently review the trial court's merits determination. *Id.* ¶¶ 5–7. And because appellate review was "strictly limited to the record on appeal," the appellate court "presume[d] the regularity" of the trial court's proceedings and affirmed the trial court on that basis. *Id.* ¶¶ 8–11. Hendrix appealed, (Doc. 24, #1397), and the Ohio Supreme Court once again declined jurisdiction on June 12, 2019, (*id.* at #1433).

Just over a month later, Hendrix filed a second post-conviction petition, arguing: (1) that trial counsel was ineffective (a) for failing to call medical experts and witnesses to testify that Hendrix's wound could not have resulted from a .45 caliber hollow-point bullet, and (b) for failing to impeach the five neighbor witnesses with purported inconsistencies in their police statements; and (2) that the government violated *Brady v. Maryland*, 373 U.S. 83 (1963), by allowing its witnesses to testify inconsistently from their police statements. (Doc. 24, #1434, 1443–68). The government moved to dismiss the petition as untimely and successive. (*Id.* at #1473).

The trial court granted the government's motion and dismissed the second petition as untimely and successive. (*Id.* at #1501–02). Hendrix appealed, (*id.* at #1503), and the Ohio Court of Appeals affirmed on the same basis. *State v. Hendrix*, 2021-Ohio-3470, ¶¶ 12–16 (1st Dist.) (*Hendrix III*).

E.      **Habeas Petition**

Hendrix filed a federal habeas petition in this Court on September 15, 2017. (Doc. 1). He initially raised seven grounds for relief—identical to the grounds he raised on direct appeal. (*See id*. at #19). Much of the subsequent (and lengthy) litigation history for this habeas action is not material to adjudicating Hendrix's motion. As relevant here, the State of Ohio filed a Return of Writ (an answer) (Doc. 8) and has amended that return twice. (Docs. 25, 52). Hendrix thereafter filed a Traverse (reply). (Doc. 79). Magistrate Judge Merz then issued his R&R advising the Court to dismiss the petition with prejudice. (Doc. 88). Hendrix objected to that R&R. (Doc. 105). The Court returned the matter to the Magistrate Judge with instructions to issue a Supplemental R&R responding to Hendrix's objections. (Doc. 106). Magistrate Judge Merz did so, once again recommending that the Court dismiss Hendrix's petition with prejudice. (Doc. 107).

The Supplemental R&R advised that Hendrix would have fourteen days to object. (*Id*. At #2605). Hendrix once again objected. (Doc. 116). The R&Rs and corresponding objections are ripe for review.

## LEGAL STANDARD

When a party properly objects to a Magistrate Judge's R&R, the Court reviews the R&R de novo. *Williams v. Parikh*, ___ F. Supp. 3d ___, 2023 WL 8824845, at *2 (S.D. Ohio 2023). However, while the Court's review of the R&R is de novo, its review of the underlying state court decisions in a habeas proceeding is highly constrained.

In 1996, Congress overhauled how federal courts adjudicate habeas petitions with the passage of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (1996). AEDPA affects the Court's review in several ways.

First, AEDPA serves as a gatekeeper by requiring a petitioner to exhaust his substantive claims in the courts of the state in which he is confined. 28 U.S.C. § 2254(b)(1). Beyond AEDPA's textual exhaustion requirement, the Supreme Court has found that the principle undergirding the exhaustion rule—allowing a state court to address the merits of a constitutional claim "in the first instance"—requires a federal court to dismiss claims that are technically exhausted (in the sense that there is no further avenue for state court review), but that a state court did not adjudicate on the merits because the petitioner failed to follow a state procedural rule. *Davila v. Davis*, 582 U.S. 521, 527 (2017) (citation omitted). A petitioner is said to have "procedurally defaulted" such claims.[2] *See Coleman v. Thompson*, 501 U.S. 722, 729–32 (1991). And the existence of the adequate and independent state ground (e.g., a state's procedural rule against hearing untimely claims) for denying the petitioner's claim generally prevents federal review of it. *Id.* At 732. That said, the procedural default doctrine is not an inexorable rule. A federal court may adjudicate a procedurally defaulted claim if the petitioner shows both "cause for the default and prejudice from a violation of federal law." *Martinez v. Ryan*, 566 U.S. 1, 10 (2012).

---

[2] A petitioner may also default a claim by failing to raise it within the relevant state's statute of limitations period, such that the state court never hears the claim in the first place. *Hannah v. Conley*, 49 F.3d 1193, 1195–96 (6th Cir. 1995).

Second, even as to those claims that the federal court may consider, AEDPA still requires the court to show significant deference to the state court's decision. Once a petitioner has exhausted his claims in state court and the state court has adjudicated those claims on the merits, a federal court may grant habeas relief only if the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or if the decision "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(1)–(2). And a state court decision unreasonably applies federal law only when it is impossible for "fairminded jurists" to disagree that the state court decision conflicted with Supreme Court precedent. *Harrington v. Richter*, 562 U.S. 86, 101–02 (2011).

Third, AEDPA limits the materials a federal court may consult when determining whether the state court decision was unreasonable—both as to facts and law. As to facts, a federal court may not hold an evidentiary hearing unless a habeas claim relies on "a new rule of constitutional law" or "a factual predicate that could not have been previously discovered through the exercise of due diligence." 28 U.S.C. § 2254(e)(2). Absent any evidentiary hearing, the federal court's review is limited to the state court record. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) ("[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."). As to the law, AEDPA allows a federal court to grant relief only if the state court unreasonably applied federal law, "*as determined by the*

*Supreme Court of the United States.*" 28 U.S.C. § 2254(d)(1) (emphasis added). In other words, that a state court misapplied—or even contradicted—lower federal court precedent cannot serve as a ground for habeas relief. *Kernan v. Cuero*, 583 U.S. 1, 8 (2017). And even as to Supreme Court cases, dicta, or even holdings framed at a "high level of generality," do not qualify as clearly established federal law and therefore cannot justify habeas relief. *Brown v. Davenport*, 596 U.S. 118, 136 (2022).

## LAW AND ANALYSIS

Hendrix's habeas petition raised seven grounds for relief. (Doc. 1, #19–20). Hendrix abandoned several of those grounds or their subparts in his reply. (Doc. 79, #2269). The grounds that remain are the following: (1) the trial court improperly allowed the government to impeach Hendrix with his prior felony convictions; (2) the trial court improperly overruled Hendrix's *Batson* challenge; (3) trial counsel was ineffective for (a) failing to use a peremptory strike on Juror 12, and (b) failing to present medical, ballistic, and forensic experts and witnesses; and (4) Hendrix's conviction was supported by insufficient evidence. (Doc. 88, #2392). The Court considers each in turn.

## A.      Ground One: Improper Impeachment with Prior Convictions

Hendrix argues that he is entitled to habeas relief because the trial court improperly allowed the government to impeach him with his prior convictions. This was error, Hendrix maintains, because (1) he had already stipulated to the two convictions relevant to Counts 9 and 10 of the indictment, which means the state did not need to introduce Hendrix's prior convictions to support those Counts; and (2) the

14

introduction of these prior convictions was highly prejudicial because its sole use was to show Hendrix's propensity for violent crime. (Doc. 79, #2277–81).

The Supplemental R&R recommends dismissing Hendrix's first claim because (1) violation of a rule of evidence is not cognizable in habeas; and (2) to the extent Hendrix claims the impeachment denied him due process of law, no Supreme Court precedent clearly establishes that using past convictions for impeachment in these circumstances violates a defendant's due process rights. (Doc. 107, #2585–86). The Court agrees with the Supplemental R&R. AEDPA prohibits federal courts from granting the writ of habeas corpus unless the petitioner is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Violations of state evidentiary rules do not provide a ground for relief in habeas. *Bey v. Bagley*, 500 F.3d 514, 519 (6th Cir. 2007). Moreover, no clearly established Supreme Court precedent holds that a state violates due process by permitting propensity evidence. *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).

Hendrix objects, essentially reiterating his prior argument:[3] the prior convictions were not probative and were highly prejudicial. (Doc. 116, #2633–36). He states, "[w]hen an evidentiary ruling is so egregious that it results in a denial of fundamental fairness, it may violate due process and this warrants habeas relief"— ostensibly quoting a Supreme Court case called *Seymour v. Walker*. (*Id.* at #2634).

---

[3] The Court uses this shorthand not to imply that Hendrix's objections are improper for "repeat[ing] … verbatim" his prior arguments to the Magistrate Judge, *Jennifer R. V. v. Comm'r of Soc. Sec.*, No. 1:19-cv-114, 2023 WL 6583815, at *5 (S.D. Ohio Oct. 10, 2023), but that the thrust of Hendrix's legal reasoning is the same and that any unmentioned differences are immaterial to the resolution of the claim.

But that purported Supreme Court case does not exist.[4] A Sixth Circuit case, *Seymour v. Walker*, 224 F.3d 542 (6th Cir. 2000), discusses evidentiary rulings in the habeas context but does not contain the quoted language. The quoted language actually comes from *Bugh v. Mitchell*, another Sixth Circuit case. 329 F.3d at 512. But as already stated, Sixth Circuit cases do not clearly establish the contours of federal law for the purposes of habeas relief under AEDPA and therefore cannot support Hendrix's claim. *Kernan* 583 U.S. at 8.

Hendrix also cites *Lisenba v. California*, 314 U.S. 219, 227–28 (1941), which states that "similar but disconnected acts may be shown to establish intent, design, and system." He argues that because the government in his case did *not* use his prior convictions to establish intent, design, and system, its use of the prior convictions for impeachment purposes was therefore improper. (Doc. 116, #2634). But that does not follow. Just because the state's use of prior similar acts in *Lisenba* was *justified* by its tendency to show an intent, design, or system does not mean those uses are constitutionally *required* every time the state wishes to bring up similar past conduct. *Lisenba* simply stated that "[t]he Fourteenth Amendment leaves California free to adopt a rule of relevance which the court below holds was applied here." 314 U.S. at 227–28. It does not clearly establish that using prior convictions for impeachment purposes—even where highly prejudicial—violates a defendant's due process rights.

---

[4] The U.S. reporter citation Hendrix provided links to yet another case, *Montana v. Egelhoff*, 518 U.S. 37 (1996). But *Egelhoff* does not help Hendrix either. It concerns a criminal defendant's right to *present* evidence the trial court otherwise deemed inadmissible, not *exclude* evidence the defendant believes is prejudicial. *See id.* at 41–45.

Because Hendrix has not shown that the state court unreasonably applied clearly established federal law related to Ground One, this objection is **OVERRULED**.

## B.   Ground Two: Trial Court Erred by Overruling *Batson* Challenge

Hendrix maintains that the trial court erred by overruling his *Batson* challenge because the trial court failed to evaluate whether the government's proffered reasons for striking Juror 1 were pretextual and because the government's proffered reasons were in fact pretextual. (Doc. 79, #2282–85). The Supplemental R&R recommends dismissing this claim because *Batson* does not require judges to record whether they found the government's reason pretextual mid-trial and because Hendrix has not shown that the government's reasons were pretextual. (Doc. 107, #2590). Hendrix's objection largely reiterates his prior argument: (1) the trial court did not follow *Batson*'s three-step analysis, and (2) the prosecutor's reasons were pretextual because Juror 1 said she had no ill-will towards the Springfield Township Police Department and denied that her unrelated civil lawsuits affected her view of the court system. (Doc. 116, #2636–41).

Starting with the first portion of Hendrix's objection, he is correct that *Batson* and its progeny require the trial court to evaluate whether the government's peremptory strikes are racially motivated in three steps: (1) the defendant must present a prima facie case of discrimination, (2) the government must provide a race-neutral reason for the peremptory strike, and (3) the trial court must evaluate whether that reason is pretextual. *Flowers v. Mississippi*, 588 U.S. 284, 298 (2019).

And he is also correct that the trial court here might not have formally recorded those steps in sequential fashion.[5] The trial court summarized the sidebar as follows:

> During the sidebar conversation, defense counsel raised a *Batson* challenge indicating that it was an African-American female and that she had indicated she could be fair and impartial and that she also indicated she had no animosity or ill will towards the police.

> The prosecutor offered as a reason for the challenge that the criminal background as well as civil lawsuits that she was involved with and also that he thought she was too eager to serve. The Court found it to be race-neutral reasons that were offered and therefore allowed the prosecutor to exercise the peremptory challenge of Prospective Juror Number 1.

(Doc. 7-1, #489). The trial court did not explicitly say on the record whether it found the government's reasons to be pretextual.

However, Hendrix has presented no Supreme Court precedent stating that a trial court judge must *formally record* his findings about whether the reason proffered is pretextual beyond the implicit evaluation inherent in simply overruling or sustaining the objection. *Batson* itself does not explicitly require an on-the-record ruling on that issue. 476 U.S. at 98 (trial court has "*duty to determine* if the defendant has established purposeful discrimination" (emphasis added)). Nor do subsequent cases. *See Flowers*, 588 U.S. at 298 (A "trial judge must *determine* whether the prosecutor's stated reasons … were a pretext for discrimination." (emphasis added)); *Miller-El v. Dretke*, 545 U.S. 231, 252 (2005) (A trial judge must "*assess* the

---

[5] The Court says "might" because it cannot know for sure. The sidebar conversations (which is where the *Batson* challenge was voiced) were not transcribed word-for-word but were later summarized by the trial court outside the presence of the jury. And the summary present in the state court record could be interpreted consistently with the trial court's evaluating whether the government's reasons were pretextual but summarizing the sidebar in an abridged manner. (*See* Doc. 7-1, #489). Ultimately, as will be shown, it does not matter whether the trial court formally recorded a finding at step three.

plausibility of that reason in light of all evidence[.]" (emphasis added)); *Johnson v. California*, 545 U.S. 162, 168 (2005) ("The trial court must then *decide* whether the opponent of the strike has proved purposeful racial discrimination." (cleaned up) (emphasis added)). Notably absent from any Supreme Court cases is language connoting a trial judge's duty to articulate, to explain, or to state his reasons or findings as to whether a race-neutral reason is pretextual. And even if one could plausibly argue that *Batson* and its progeny require such an articulation, the question here is not whether, on de novo review, *Batson* requires an explanation by the trial court, but rather whether the state court *unreasonably applied Batson* in holding that the trial court did not err. *See* 28 U.S.C. § 2254(d)(1). Because fair-minded jurists could disagree over whether the state court ran afoul of *Batson*'s requirements, the Court holds that the state court did not unreasonably apply clearly established federal law. *Harrington*, 562 U.S. at 101–02.

Moreover, even if it did, the trial court's purported error would not warrant habeas relief. Once a habeas petitioner shows that some constitutional error took place at his trial, a federal court may grant habeas relief only if that error had a "substantial and injurious effect" on the verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (citation omitted). True, actual *Batson* errors—that is, a government's violation of the Equal Protection Clause by racially discriminating in jury selection— are structural errors that require no proof of prejudice. *United States v. Kimbrel*, 532 F.3d 461, 469 (6th Cir. 2008). But that is not the claim here. The crux of Hendrix's objection is that the trial court's procedural failure to create a formal record as to

whether the government's reasons for striking Juror 1 were pretextual violated *Batson*. (Doc. 116, #2638). *That* purported error is at most a failure to follow a prophylactic portion of *Batson*'s jurisprudence (some kind of recording requirement), not an Equal Protection Clause violation. But that in turn means that *Brecht*'s prejudice requirement applies here. And that is a problem, as Hendrix does not show that, if the trial court had stated formally its consideration of pretext on the record that its ruling would have changed. Accordingly, he cannot demonstrate that the trial court's purported error warrants habeas relief.

The Court makes quick work of the second portion of Hendrix's objection. Hendrix argues that the prosecutor's reasons were pretextual. His argument boils down to a claim that the trial court simply should have believed Juror 1 and disbelieved the government. He presents no new argument or evidence establishing that the government's reasons were pretextual. Because a fair-minded jurist could conclude that the trial court did not err by overruling Hendrix's *Batson* challenge, this objection is **OVERRULED**.

## C. Ground Three: Ineffective Assistance of Trial Counsel

Ground Three asserts that Hendrix's trial counsel was ineffective based on two distinct failures: (1) failing to utilize a peremptory strike on Juror 12; and (2) failing to present medical, ballistic, and forensic experts and witnesses. Under *Strickland v. Washington*, a criminal defendant's Sixth Amendment right to counsel is violated when (1) counsel's performance is so deficient and his errors so egregious that he

cannot be considered "counsel" under the Sixth Amendment, and (2) the errors made by counsel prejudiced the defendant. 466 U.S. 668, 687 (1984).

### 1. Failure to Utilize a Peremptory Strike on Juror 12

Hendrix claims that his trial counsel was ineffective for not peremptorily striking Juror 12 because she suggested she would be more inclined to believe four witnesses over one. (Doc. 79, #2285–86). The Supplemental R&R recommends dismissing this claim because Hendrix has not shown that Juror 12 was biased against him. (Doc. 107, #2591–92). Hendrix objects by repeating his argument that Juror 12 was biased and adding that counsel should not have believed Juror 12's promises to be fair and impartial. (Doc. 116, #2641–44).

When considering an ineffective-assistance-of-counsel claim in a habeas petition, the Court's review is "doubly deferential." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). The first layer of deference is to trial counsel's decisions. The Court must presume that "counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 124 (citation omitted). The second layer of deference is to the state court decision finding that the ineffective-assistance claim lacks merit. *Id.* at 122–23. Under AEDPA, the Court may grant habeas relief only if the state court's application of *Strickland* was unreasonable. *Id.* at 123. And because *Strickland*'s ineffective-assistance-of-counsel standard encompasses a wide range of performance quality, the Court must give "even more latitude" to the state court's decision than a narrower rule would warrant. *Id.*

The Court cannot conclude that the state court's decision—which found that trial counsel's choice to forgo striking Juror 12 was reasonable—unreasonably applied *Strickland*. *Hendrix I*, 2016-Ohio-2697, at ¶ 37. Juror 12, in response to the trial court's questions, stated she would be fair to all parties and would weigh witness testimony independently. (Doc. 7-1, #459–61). A reasonable lawyer could conclude such a juror could be fair and impartial. And even if this Court disagreed that a reasonable lawyer would forgo striking Juror 12, it cannot conclude that *every* fair-minded jurist would hold that view. Accordingly, Hendrix's objection is **OVERRULED**.

### 2. Failure to Present Medical, Ballistic, and Forensic Experts and Witnesses

Hendrix's next claim is more complicated. That is because he has raised this claim twice—first in his original state post-conviction petition, (Doc. 7, #231), and then again in his second state post-conviction petition, (Doc. 24, #1444–56). Hendrix's first post-conviction petition included only one exhibit—the Gary Rini report. (Doc. 7, #253–69). And the state court denied the claim on the merits. *Hendrix II*, 2018-Ohio-3754, at ¶¶ 8–9. Hendrix's second post-conviction petition raised the same (or at least similar) argument but included far more extra-record evidence, including medical reports, expert reports, police interview transcripts, and an affidavit from his trial attorney, John Forg. (Doc. 51, #1888–1924). This second post-conviction petition, however, was not adjudicated on the merits because the state court dismissed it as untimely and successive. *Hendrix III*, 2021-Ohio-3470, at ¶¶ 12–16. So, unless Hendrix can overcome the procedural default that applies to his second post-

22

conviction petition, this Court's review is limited to the arguments Hendrix made and the evidence he presented in his first post-conviction petition. *See Cullen*, 563 U.S. at 181. Thus, the Court first addresses whether Hendrix's procedural default can be excused.

### a. Cause for Procedural Default: Ineffective Assistance of Post-Conviction Counsel

The Supreme Court has held that a habeas petitioner can show cause to excuse a procedural default when post-conviction counsel is ineffective in failing to raise an ineffective-assistance-of-trial-counsel claim in a post-conviction petition where that petition is the first opportunity to raise such a claim before the state courts. *Martinez v. Ryan*, 566 U.S. 1, 14 (2012). But when considering whether post-conviction counsel is ineffective, a federal court is limited to the evidence presented in the state court record. *Shinn v. Ramirez*, 596 U.S. 366, 382 (2022).

Hendrix argues that his post-conviction counsel (for his first petition), Christopher Pagan, was ineffective in failing to obtain evidence from Hendrix's direct-appeal counsel, Joshua Thompson. (Doc. 105, #2537–40). Had Pagan exercised due diligence and obtained the voluminous evidence still retained by Thompson, Hendrix argues, Pagan would have been able to provide more evidence to Gary Rini, Hendrix's retained expert. (*Id.* at #2540).

The Supplemental R&R states that Hendrix's procedural default should not be excused on this basis because (1) Pagan's performance did not prejudice Hendrix because the state court found the Rini report incredible anyway, or, alternatively, (2) Hendrix has not fully exhausted this claim because he has not moved for a new

trial under Ohio law. (Doc. 107, #2598–99). Hendrix's objection nitpicks the Supplemental R&R's language but at bottom presents the same argument described above. (Doc. 116, #2669–82).

The Court need not delve into whether the R&R's conclusions were correct because it sees a more fundamental flaw with Hendrix's argument: it relies on evidence the Court may not consider. Hendrix states that Pagan never procured evidence from Thompson—something that every competent attorney would do to investigate the background of a case. But Hendrix's only evidence to support this statement is a private letter appended to an amended habeas petition that was previously stricken because it was belatedly filed. (*See* Doc. 105, #2539 (citing Doc. 77, #2229–30)). This letter is found nowhere in the state court record. Neither is the rest of the material that he included in his stricken amended petition. (*See* Doc. 77, #2231–35). Absent this evidence, the only basis from which the Court can determine whether Pagan was ineffective is the absence of Hendrix's medical records and other materials in his first post-conviction petition. In other words, Hendrix's argument requires the Court to infer, based solely on the fact that Hendrix presented more materials in his second post-conviction petition than he presented in his first post-conviction petition, that Pagan was ineffective in his investigation. Given the level of deference the Court owes counsel, it cannot conclude that Pagan was ineffective based solely on such an inferential leap. *See Martinez*, 566 U.S. at 14 (adopting *Strickland*'s ineffectiveness standard). Accordingly, the Court will not excuse Hendrix's procedural default on this basis.

### b.    Cause for Procedural Default: Actual Innocence

Another way to overcome procedural default is by showing that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327 (1995) (citation omitted). To make this showing, a petitioner must establish that "it is more likely than not that no reasonable juror would have convicted him." *Id.* When presenting an actual-innocence claim to overcome a procedural default, a habeas petitioner must present "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Id.* at 324. Unlike a substantive habeas claim, actual-innocence claims (which are not actually substantive grounds for habeas relief but merely an excuse for a procedural default) not only allow a petitioner to submit evidence not presented before state courts but also allow a federal court to consider evidence that would not otherwise be admissible at trial. *Id.* at 327–28. If a petitioner demonstrates his actual innocence, a federal court must excuse the procedural default to avoid a miscarriage of justice. *Id.* at 327.

Hendrix's arguments in his original objections to the first R&R, (Doc. 105), and his objections to the Supplemental R&R, (Doc. 116), are sufficiently similar that the Court will summarize them together. Hendrix claims that many pieces of evidence cast doubt on the government's theory that Jay Dillon shot Hendrix. He argues that the lack of a bloodstain pattern on the street, the purported upward trajectory of the bullet through his body, the small size of the wounds as compared to a .45 caliber bullet, and the lack of shards or particles in his gunshot wound (as would be expected

from a hollow-point bullet) demonstrate that a second shooter shot Hendrix. (Doc. 105, #2540–48, 2552–57; 116, #2683–99). And because the State's theory was that Dillon shot Hendrix, Hendrix claims that this new evidence demonstrates his innocence.

The Supplemental R&R disagrees by concluding that while the new evidence might call into question that it was Dillon who shot Hendrix, none of the evidence establishes Hendrix's innocence. (Doc. 107, #2601). Correct. Hendrix's innocence of his attempted murder charges does not turn on where he was standing or even who shot him. It turns on whether Hendrix was the first aggressor in the neighborhood shoutout. And nothing Hendrix has provided shows that he was not the first aggressor. *Hubbard v. Rewerts*, No. 21-2968 (6th Cir. Apr. 16, 2024) (slip op. at 14) (Actual innocence requires petitioner to show "the probability of his innocence, rather than merely impeach[ing] the State's case.") (cleaned up). Hendrix has not shown that it is "more likely than not" that no reasonable juror would have convicted him. *Schlup*, 513 U.S. at 327. Hendrix has therefore not shown cause to excuse his procedural default.

### c. Merits of Non-Defaulted Claim

Because the arguments and evidence underlying Hendrix's second post-conviction petition have been procedurally defaulted, the Court considers only the first post-conviction petition to determine whether Hendrix's trial counsel was ineffective. But before examining the merits of Hendrix's ineffective-assistance-of-

counsel claim, the Court must address Hendrix's argument that AEDPA's deferential review does not apply here.

The Supplemental R&R states that the state court adjudicated his claim on the merits, even if it did so in only a summary order. (Doc. 107, #2602). Hendrix argues that the state court did not adjudicate his ineffective-assistance-of-counsel claim on the merits because it did not "reach the core" of his argument.[6] (Doc. 116, #2701 (quoting *Campbell v. Bradshaw*, 674 F.3d 578, 596 (6th Cir. 2012)). The Supplemental R&R is correct. The trial court denied Hendrix's first post-conviction petition because it determined that the Rini report was not credible and that Hendrix had established no grounds for relief. (Doc. 7, #283). While the trial court's order was no doubt a summary order with very little analysis, the Supreme Court has stated that such orders must be considered "adjudicated on the merits" for the purposes of AEDPA review. *Harrington*, 562 U.S. at 98–100. And because *Hendrix II* affirmed the trial court opinion based on a presumption of "regularity" (correctness), *Hendrix II*, 2018-Ohio-3754, at ¶¶ 8–9, the Court must presume that the state appellate court affirmed for the same reasons stated in the trial court order. *Wilson v. Sellers*, 584 U.S. 122, 125–26 (2018). The last state court adjudicated this claim on the merits and therefore AEPDA's deferential review applies. *See* 28 U.S.C. § 2254(d).

On to the merits. Hendrix's argument, boiled down to the portions not procedurally defaulted, is that his trial counsel should have put on evidence related

---

[6] He also argues for the first time in his objections that the cursory nature of the trial court's order violated his due process rights. (Doc. 116, #2701). This claim was not raised in his petition and therefore is a nonstarter.

to the forensic investigation of the crime to undermine the government's case—specifically, the Rini report. (Doc. 79, #2290). The Supplemental R&R recommends dismissing this claim because the state court permissibly held that the report was not credible. (Doc. 107, #2593). Hendrix objects, but he relies on much of the evidence the Court has already stated it cannot consider. (Doc. 116, #2664–66). Looking only at the Rini report, the Court concludes that the state court did not unreasonably apply *Strickland* in determining that counsel was not deficient for failing to call a noncredible witness.

Much of the Rini report criticizes the forensic investigation for irrelevant oversights. For example, as support for his conclusion that the investigation was flawed, the report states, "Detective Volz used a metal detector on Dillon's property, but not on Hendrix's property." (Doc. 7, #265). He also claims that the investigation was flawed because police did not perform gunshot residue tests on the other men and because they did not seize and analyze Hendrix's vehicle. (*Id.* at #266). Other than casting the thinnest cloud of doubt on the general reliability of the investigation, the report does not help Hendrix at all. Sure, the report claims that bloodstain analysis should have been done on the street, but that does not establish that Hendrix did not fire first. (*Id.* at #267).

The only portion of the report claiming that Hendrix shot second relies on dubious logic. (*See id.* at #268). The Rini report claims that Hendrix must have shot second because he had his revolver on him when he was found in his neighbor's backyard. (*See id.*). This follows, the report concludes, because Hendrix would have

dropped his weapon if he had been holding it when he was shot in the abdomen. (*Id.*). But Hendrix could have easily picked up his dropped weapon when he fell down on the ground before fleeing. In sum, the Court concludes the state court did not unreasonably conclude that the Rini report is not credible. And because the report's conclusions are reasonably found not to be credible—that is to say, not so clearly credible as to render counsel ineffective for failing to call the expert behind the report, Gary Rini, as a witness—Hendrix's claim fails. This objection is **OVERRULED**.

## D.  Ground Four: Insufficient Evidence

Under *Jackson v. Virginia*, a conviction violates a defendant's due process rights if, after viewing all the evidence in the light most favorable to the prosecution, no "rational trier of fact" could have found that the state proved all of the elements of the crime beyond a reasonable doubt. 443 U.S. 307, 319 (1979).

Hendrix argues that four counts of his conviction, two counts of felonious assault and two counts of attempted murder, rest on insufficient evidence because no evidence establishes that Hendrix attempted to hurt or to murder Christopher White or Kevin Tye. (Doc. 79, #2291–97). Hendrix claims that the evidence showed that he never shot at or even near White or Tye and shot only towards the firepit (near Donald Raines) or at Dillon. (*See id.*). The Supplemental R&R concludes that the jury could permissibly find Hendrix guilty given all the evidence before it. (Doc. 107, #2604). Hendrix objects claiming that because Tye was by Dillon's truck and White was by Dillon's front door, that neither man was in the line of fire when Hendrix shot at Dillon, who was in the middle of his front yard behind a tree. (Doc. 116, #2705–07).

The Court finds that the state court did not unreasonably apply *Jackson v. Virginia* when affirming Hendrix's conviction. The state court noted that, under Ohio law, the mens rea element of attempted murder could be inferred from a defendant's action of discharging a gun in another's general direction. *Hendrix I*, 2016-Ohio-2697 at ¶ 44. Given that the evidence adduced at trial placed White, Tye, and Dillon all generally in front of Dillon's home, (*see* Doc. 7-2, #574; Doc. 7-3, #641, 674–75, 704–05), the state court found that sufficient evidence supported the attempted murder charges. *Hendrix I*, 2016-Ohio-2697 at ¶ 44. The Court agrees. A rational trier of fact could have concluded that Hendrix had the specific intent under Ohio law to kill Tye and White by shooting in their general direction. This objection is **OVERRULED**.

## CONCLUSION

For the foregoing reasons, the Court **ADOPTS** the R&R (Doc. 88) and the Supplemental R&R (Doc. 107) and **OVERRULES** Hendrix's objections (Docs. 105, 116). The Court **DISMISSES** Hendrix's habeas petition (Doc. 1) **WITH PREJUDICE**.

Under Rule 11(a) of the Rules Governing 2254 Cases in the United States District Courts, the Court also "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Accordingly, the Court **DENIES** Hendrix a certificate of appealability under 28 U.S.C. § 2253(c) as to all claims because reasonable jurists could not disagree with the Court's adjudication of Hendrix's habeas claims. *Kuck v. Robinson*, No. 19-3226, 2019 WL 2564578, at *1 (6th Cir. June 10, 2019).

The Court **DIRECTS** the Clerk to enter judgment and to **TERMINATE** this case on its docket.

**SO ORDERED.**

April 19, 2024
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**